**Electronically Filed
Supreme Court
SCWC-22-0000357
15-SEP-2025
09:28 AM
Dkt. 21 OPA**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

KP,
Petitioner/Petitioner-Appellant,

vs.

EM,
Respondent/Respondent-Appellee.

SCWC-22-0000357

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-22-0000357; CASE NO. 2PA211000062)

SEPTEMBER 15, 2025

RECKTENWALD, C.J., EDDINS, AND DEVENS, JJ.;
WITH GINOZA, J., CONCURRING SEPARATELY AND DISSENTING,
WITH WHOM McKENNA, J., JOINS

OPINION OF THE COURT BY EDDINS, J.

This child custody case involves the custody and relocation of two young children. They were born in Utah in 2016 and 2018 to two young adults who had grown up in Utah. The children moved to Hawai'i with their mother, KP (Mother), in December

2019.  EM (Father) moved to Hawai'i a few months later, in March 2020.

In May 2021, Mother sought sole legal and physical custody of the children.  She claimed Father was sexually abusing his five year-old son and three year-old daughter.  In August 2021, Father sought sole legal and physical custody.  He also requested permission to move with the children back to Utah.

After a three-day bench trial, the court granted custody to Father, and allowed him to move to Utah with the children.  Mother was granted supervised visitation.

Mother raises three arguments on appeal.  First, she argues that the trial court erred by excluding fact and expert witness testimony regarding the credibility of the children's sexual abuse disclosures.  Second, she claims the court erred in excluding hearsay evidence about the disclosures.  Third, Mother argues that the court abused its discretion in awarding Father sole custody and allowing him to relocate to Utah with the children.

We hold that the family court (1) made proper evidentiary rulings; and (2) did not abuse its discretion in awarding Father legal and physical custody and allowing him to move with the children to Utah.

The family court correctly ruled that under State v. Batangan, it is improper for a witness to testify about the

credibility of an alleged child sexual abuse victim. 71 Haw. 552, 799 P.2d 48 (1990). The court also correctly precluded evidence as inadmissible hearsay.

We also hold that the family court did not abuse its discretion in awarding Father sole legal and physical custody and approving Father's relocation to Utah with the children. The court properly considered the relevant Hawai'i Revised Statutes (HRS) § 571-46(b) (2018) factors. Our review of the record supports the court's findings.

We affirm the ICA's judgment and the family court's decision and order.

## I.

### A.    Factual Background

Mother and Father have two children together: a boy, Jack, and a girl, Grace. (To protect the minors' privacy, we use pseudonyms.)

Mother, an only child, was born in Oregon, and raised in Colorado. She moved to Utah at age sixteen. Father was born and raised in Utah.

Mother and Father met in Utah as sixteen year-olds and "connected through mutual drug use." They both had alcohol and drug addictions. Their drug use included heroin and methamphetamine.

Mother and Father lived with Mother's parents. Father reported moving out of his mother's home because she did not tolerate drug use. Mother's parents allowed KP and EM to use drugs and skip school while living in the home.

Jack was born in November 2016. Mother and Father were then eighteen years old. After their son's birth, both stopped using drugs for almost two years. They continued living with Mother's parents until after their second child was born.

Grace was born in March 2018. Mother and Father were twenty years old. After Grace was born, they moved out of Mother's parents' home in Utah. In November 2018, they purchased their own home. Father worked in a regional grocery store warehouse while Mother was a stay-at-home mom.

In early 2019, both relapsed.

KP and EM broke up. Mother moved back in with her parents. They split custody without a formal custody agreement. The children spent the night at either Father's house, the maternal grandparents' house, or Paternal Grandmother's house. Father moved in with his father and attended an outpatient program.

Then they entered separate in-patient drug rehabilitation programs. In March 2019, Mother was admitted to a holistic drug rehabilitation facility in Colorado. It allowed her to care for the children. Father attended treatment in Utah.

In December 2019, Mother moved with the children and her parents to a house in Pāʻia, Maui. The record does not explain Mother's parents' connection to Maui or show whether Mother's parents rented or owned the Pāʻia home. Soon Mother relapsed. In February 2020, Mother sought treatment from a Kahului, Maui rehabilitation facility.

In March 2020, three months after Mother moved from the mainland to Maui, Father moved to Maui. He wanted to be part of his children's lives. When he moved, he was under the impression the move was temporary, and they would move back to Colorado or Utah to co-parent the children.

Father found work at the Maui Dragon Fruit Farm. He earned $1,500 a month, collected around $400 a month in food stamps, and received housing through his employer. Father took a second job. He worked at Cheeseburger in Paradise, and then at Paia Fish Market in Lahaina.

At the farm, Father lived in the master bedroom of an RV. That room had a separate entrance. In July 2021, Father's employer promoted him to manager. She also offered Father a three-bedroom, two-bathroom home on the property to use when the children visited.

In July 2020, Mother sought refuge at a domestic violence shelter. Mother's thirty-nine-year-old boyfriend had assaulted her. On July 18, 2020, Mother reported to Maui police that her

boyfriend of four months had confined her to a room and threatened to stab her to death if she left.  The two had smoked methamphetamine earlier that day.  The boyfriend punched and strangled her.  The man threatened to kill her and her children.

Against Father's wishes, Mother had at times let the children stay with Mother and the boyfriend.  The parties dispute whether the children saw violent acts and drug use when Mother dated the man.

Weeks later, in August 2020, Mother's parents (Maternal Grandmother and Maternal Grandfather) rented a home in Kahakuloa that the custody evaluator described as an upscale home.  Mother and the children moved in.  Maternal Grandmother said they moved there because "there was a drug house across the street [from the Pā'ia House]."  The custody evaluator reported that they moved "partly to get her away from the drug-related culture [Mother] was exposed to in Paia."

Soon after they moved in, still in August 2020, Maternal Grandmother and Mother purportedly saw the children engaged in "sexually suggestive behaviors."  Maternal Grandmother told Mother she saw "red flags."  Mother also later reported to Child Welfare Services (CWS) "[that Jack] made humping movements, [and the children put their] butts in each other's faces, thinking it was funny."

Mother hatched a plan. That same month, Mother told Father she had video surveillance of him sexually abusing the children at her parents' previous house in Pāʻia. (She did not.) Father denied sexually assaulting his son and daughter. Later he said that he didn't know where Mother's accusation came from, and that he knew he hadn't done anything wrong. Months later Mother told a custody evaluator that she had lied to Father about the footage because she "hop[ed] that [Father] would admit what he did."

Father reported that after the false accusation, he did not feel safe. He visited with the children in public parks or at the maternal grandparents' home with supervision. Only twice did he have the children at his home for overnight visits.

Father testified that in December 2020, Mother said she would give him custody and allow him to take the children to Utah. "[S]he's had enough and she doesn't want to be a mother anymore . . . [she] told me that she wants me to take the kids full time and if I want to do that in Utah, I can." He had previously shared this information with the custody evaluator, Sandy Shiner (CE Shiner).

Father gave notice to the dragon fruit farm and the Paia Fish Market that he was returning to Utah with his children. Father's employer at the fruit farm wished him well. She purchased tickets for Father and the two children to return in

early January 2021. But just hours after Father quit his food service job, Mother called. The plan "isn't happening," she said. The children and Father therefore remained in Hawai'i.

Three months later, in April 2021, Maternal Grandmother called CWS. Father had been sexually abusing the children, she reported. She "cit[ed] various sexualized behaviors by the children that started in August of 2020." Maternal Grandmother also disclosed neglect for "failure to protect" by Mother.

CWS interviewed Mother. Mother informed CWS that she did not believe Father posed a danger to the children. CWS suggested a Children's Justice Center interview. Mother declined the interview, the CWS worker reported, because "she believes [the behavior the children have been displaying] is not in relation to anything the father has done."

Father believed that Maternal Grandmother's report was motivated by her wish to gain custody of the children and to prevent Father from returning with them to Utah.

## B. Family Court Proceedings

At the time of the following proceedings, Jack was around four and Grace was around three.

Judge Keith E. Tanaka of the Family Court of the Second Circuit presided over the custody case from May 6, 2021 to around June 15, 2021. Judge Adrianne N. Heely presided from June 16, 2021 to around January 13, 2022. Then, around January

8

13, 2022, Judge Lance D. Collins replaced Judge Heely as the presiding judge.

On May 6, 2021, Mother filed a "Petition for Custody, Visitation, Support Orders After Voluntary Establishment of Paternity" in family court. Mother sought legal and physical custody of the children, and requested that Father be denied visitation with the children "until further order of the Family Court."

On May 26, 2021, Mother moved for pre-decree relief. She sought sole legal and physical custody of the children, and requested that Father (1) "be ordered to undergo substance abuse and mental health assessments," (2) "be allowed supervised visitation only," and (3) "be forbidden from any threats or harm to [Mother] or the children, and from taking the children off island, like to paternal grandmother and family in the continental [United States]."

On June 3, 2021, the family court held a hearing on Mother's custody petition, and pre-decree relief motion. The court deferred its custody determination to a future hearing pending a custody evaluation. It temporarily granted Father unsupervised visitation with the children from 10 a.m. to 4 p.m. on weekends, subject to Father's negative drug test, and referred Mother's allegation of "inappropriate touching" of the children to CWS for further investigation and report.

Ten days later, on June 13, 2021, Mother reported to the Maui Police Department (MPD) that the children were "sexually assaulted by their father" in April 2021. Sexually assaulting a child ranges from a class A felony, punishable by twenty years of imprisonment, to a class B felony punishable by a ten-year term of imprisonment, to a class C felony punishable by a five-year term of imprisonment. HRS § 707-730(1)(b) and (2) (2014), § 707-731(1)(a) (2014), § 707-732(1)(b) (2014); HRS § 706-660 (2014 & Supp. 2016), § 706-659 (2014).

During Mother's interview with MPD, the responding officer noted that Mother changed her statements over the course of the interview and failed to make eye contact with the officer during the interview. The officer reported that "she was observed to be laughing and smiling at times and not upset over the allegations involving her children."

Father chose to make a statement to police two hours later. Father denied sexually touching his own children.

MPD Detective Oran Satterfield was later assigned to investigate Mother's allegations.

Thereafter, between June 18, 2021 (five days after her report to MPD), and October 20, 2021, Mother filed four sets of Ex Parte Petitions for a HRS § 586-4 (2018 & Supp. 2021) temporary restraining order (TRO) on behalf of each child. All eight petitions alleged a threat of child sexual abuse by

Father.  The family court dismissed all but one petition.  (The court granted one six-month protective order, which the family court dismissed nearly four months later, after multiple continuances and the custody trial.)

On June 29, 2021, the Children's Justice Center (CJC) interviewed the children.  Neither child made disclosures of sexual abuse.  CWS supervisor Annie Reinecke (SW Reinecke) and MPD Detective G. Katayama attended the CJC interview.  They both reported that the children made no disclosures about sexual assault during the forensic interview.

The next day, Mother filed another set of TROs on behalf of the children against Father.  The TROs were denied without a hearing.

On July 8, 2021, CWS submitted a ten-page court-ordered report assessing "allegations of sexual abuse/threat of sexual abuse" of the children by Father, and "physical neglect/threat of physical neglect (failure to protect)" of the children by Mother, pursuant to HRS § 586-10.5 (2018).  CWS concluded that "[s]exual abuse and threat of sexual abuse of [the children] by [Father] is not confirmed."  (Emphasis added.)

The report stated that "[t]here is insufficient evidence to determine the children have been molested" and that "there is too much ambiguity with respect to context, who, what, where, when and how to determine abuse."  CWS deemed audio and video

recordings of alleged disclosures (taken and provided by Mother) as "highly suggestible and leading."

CWS also had concerns about Mother's boyfriends. "The children have also been exposed to Mother's boyfriends, of whom no information is given with exception that there had been exposure to domestic violence." The report recommended that both parents undergo a substance abuse assessment and random drug testing to verify sobriety, and to attend a co-parenting program.

On July 30, 2021, Mother took the children to the Maui Memorial Medical Center emergency room. She requested a sexual assault examination because Grace had allegedly expressed pain to her vagina. A MPD sergeant called Detective Satterfield and informed him of the request. Detective Satterfield called Mother for more information. She wanted a sexual assault exam because Grace expressed pain to her vagina area five days after an unsupervised visit with Father. Detective Satterfield then scheduled a same-day forensic medical examination.

Sexual assault nurse examiner Jennifer Baumstark (Nurse Baumstark) examined both children. Grace allowed Nurse Baumstark to conduct a physical evaluation, and take photos of her anus and perineum. Grace did not have any injuries. Mother helped the nurse collect rectal DNA samples from both children to be sent for testing. Jack refused a physical evaluation and

to have pictures taken, but let Mother take rectal DNA swabs of the anal area under Nurse Baumstark's supervision. The tests were inconclusive.

During the visit, Jack stated to the examiner that his father "touches [his] butt[.]" Nurse Baumstark shared this disclosure with Detective Satterfield. Detective Satterfield later submitted Nurse Baumstark's medical reports as part of his report to the Office of the Prosecuting Attorney.

On August 5, 2021, court officer and CE Shiner filed a fourteen-page custody evaluation report with the family court based on interviews and home-visits. CE Shiner interviewed Mother, Father, and other collateral contacts including Maternal Grandmother, Maternal Grandfather, Paternal Grandmother, and Father's employer at the farm.

CE Shriner recommended joint legal and physical custody. Regarding Father, she concluded that he "appears to be a caring, nurturing parent, and the children appear comfortable with him." "Father has a home and much family support in Utah if the Court decides that he should be allowed to move back to Utah with the children. Meanwhile, he has found a job and set up at least temporary housing for himself and the children while living on Maui." CE Shiner stated that if the court determined that the children should move with Father to Utah, she would not

recommend that Mother return to Utah to share custody with Father on her own without Mother's parents.

As for Mother, CE Shiner reported that Mother also appears to be a caring, nurturing parent, and that Mother's parents provide full support in raising the children on Maui. "Due to [Mother's] history of getting involved with abusive partners and relapsing on drugs when she is not closely monitored by her parents," CE Shiner concluded, "it is not recommended that she have custody of the children if she is living on her own until there is further order of the Court."

On August 12, 2021, Father filed a "Motion for Emergency Custody and Relocation." He requested temporary emergency custody of the children and permission to relocate with the children to Utah. After Mother filed her response, the court granted several continuances, extending the trial date to January 2022. Father's motion was not heard until trial began on January 28, 2022.

Meanwhile, without a court order or Father's consent, Mother began taking the children to play therapy with a private therapist, Dr. Goldberg. Mother's attorney had referred Mother to her, Dr. Goldberg believed. On August 13, 2021 – the day after Father's emergency petition – the children began play therapy. During the children's second visit, around August 25, 2021, both children purportedly made disclosures that Father

14

"put his finger up [their] butts."  As a mandatory reporter, Dr. Goldberg reported the incident to CWS.

On September 10, 2021, Detective Satterfield and CWS social worker Leslie Armstrong (SW Armstrong) interviewed Dr. Goldberg. Detective Satterfield testified that the purpose of the interview was to "get more information about what happened in that therapy session."  Dr. Goldberg confirmed the disclosures, noting that for both children, "[w]e were building [with toys] and [the disclosure] kind of came out of nowhere."

On October 20, 2021, Mother filed another TRO on behalf of Jack against Father – now based on the children's disclosures to Dr. Goldberg.  It was the seventh order for protection petition she had filed against Father.  Mother alleged that on October 16, 2021, following an unsupervised visit with Father, Jack disclosed to Dr. Goldberg that Father touched his "peepee" earlier that day.  Mother's petition also alleged that Jack previously disclosed sex abuse to Dr. Goldberg, that she reported Jack's disclosure to the police, and that Dr. Goldberg's reporting ultimately required Detective Satterfield and SW Armstrong to interview Dr. Goldberg on September 10, 2021.

The court issued a same-day TRO for Jack against Father, to expire April 18, 2022.  The TRO also prohibited Father from contacting Grace and maternal grandparents.

15

Based on his interview with Dr. Goldberg, Detective Satterfield referred the children for another forensic interview.  On October 25, 2021, the Wailuku Children's Justice Center re-interviewed the children.  During those interviews, unlike during the first set of June 2021 CJC interviews, the children made disclosures.  According to the CWS report summarizing the interviews, when asked why he was at the interview, "Jack said it was to tell secrets."  "Jack reported that 'daddy touches my butt and my peepee[,]' [and Jack] said this happened at the Dragon Fruit Farm and was not continuing to happen."  The report also explained that "Grace reported 'Daddy touches my butt and Jack's butt[.]'  Grace said it has happened at the Dragon Fruit Farm and the park.  The children were not able to expand on these disclosures at all, so it is unclear if this is in reference to helping the children toileting or bathing or if this is indeed inappropriate touching."

On October 29, 2021, CWS submitted a three-page report requested by the court, relating to the October 20, 2021 TRO.  The report confirmed the "[t]hreat of sex abuse" to children by Father.  (SW Armstrong later testified that a "threat" of abuse does not mean that evidence confirmed actual abuse occurred – it only establishes "a possibility of that harm happening.")  The report summarized disclosures made during the forensic interviews of the children at the CJC, but noted that because

16

"[t]he children were not able to expand on these disclosures," it was unclear if the disclosures were in reference to Father "helping the children [with] toileting or bathing or if [the disclosures were] indeed [in reference to] inappropriate touching."

On November 8, 2021, the court issued an "Order for Protection" on behalf of Jack and against Father, with an expiration date of May 8, 2022.  One month later, on December 8, 2021, Judge Heely filed an amended protective order which appeared nearly identical to her original protective order, with the same expiration date of May 8, 2022.

Around January 13, 2022, Judge Lance D. Collins replaced Judge Heely as the presiding judge in the case.

**C.   The Trial**

On January 28 and 31, 2022 and February 15, 2022, the court held a bench trial to determine custody, relocation, and visitation in response to Mother's May 2021 custody petition and Father's August 2021 emergency custody and relocation motion. Thirteen witnesses testified.  Besides Father and Mother, Detective Satterfield, Father's co-worker Cameron Richards, SW Armstrong, Nurse Baumstark, CWS social worker Christianna Bhader, psychiatrist Dr. Brian Teliho, SW Reinecke, CE Shiner, psychologist Dani Riggs (Psychologist Riggs), Paternal

Grandmother, and Dr. Goldberg testified.  Maternal Grandmother and Maternal Grandfather did not testify.

The family court had lots of information to decide this case.  The parties stipulated into evidence many exhibits.  That evidence included photographs, pleadings, "reports received by the court from Child Welfare Services," "reports received by the parties from the court-appointed supervised visit monitor," "reports received by the court from the court-appointed custody evaluator," "all exhibits that consist of Maui Police Department reports," "certificates of completion [of drug rehabilitation]," and "recordings made of interviews with the subject minor children at the Children's Justice Center."

Next, we outline the trial's relevant evidentiary exchanges.

1.    **Detective Satterfield**

Father called Detective Satterfield, a MPD sex assault unit detective.  Detective Satterfield testified that he was assigned to investigate a report of possible sexual abuse of the children by Father.  He later submitted his investigation to the Office of the Prosecuting Attorney for review in late 2021.  As of the February 2022 trial, Detective Satterfield testified that he hadn't heard anything from the Prosecutor's office regarding the case.  He added that during his investigation, he did not directly interview the children.

During cross-examination, Mother's counsel asked Detective Satterfield if he believed the children were sexually abused. The court sustained Father's counsel's objection, basing that ruling on Batangan:

> **[Mother's Counsel:]**  Okay.  So do you believe these children were sexually abused?
>
> **[Father's Counsel:]**  Objection, your Honor; calls for an opinion regarding the ultimate issue.
>
> **[The Court:]**  Yeah, I'm going to sustain it because I think it's pretty clear and the case law [State v. Batangan] that witnesses cannot assist the [trier] of fact in determining this particular issue.
>
> **[Mother's Counsel:]** I'm just asking if he believes --
>
> **[The Court:]**  I understand.  And [State v. Batangan] is directly on point of this issue and it's not allowed.
>
> **[Mother's Counsel:]**  Okay.  No further questions.

## 2.  Nurse Baumstark

Mother's expert witness Nurse Baumstark testified that she conducted a sexual assault forensic examination of Grace, and that Jack refused an examination.  Mother had requested a sexual assault examination after alleging that Grace reported pain to her vagina five days after visiting Father.  Nurse Baumstark testified that Grace did not have any injuries, and that rectal DNA swabs were inconclusive.  She also relayed that during the examination, Jack disclosed to her that Father "put his finger in my butt."  The nurse later reported the disclosure to Detective Satterfield.  Mother's counsel then asked if Nurse

Baumstark believed Jack. The court sustained Father's counsel's objection. Again, per <u>Batangan</u>.

> **[Mother's counsel:]** Did they appear to -- were there any other disclosures by the boy besides "dad put his finger in my butt"?
>
> **[Nurse Baumstark:]** No.
>
> **[Mother's Counsel:]** Do you have any reason -- do you have any reason not to believe this child when he told you what his father did?
>
> **[Nurse Baumstark:]** No, I --
>
> **[Father's Counsel:]** I'm sorry. I'm going to object.
>
> **[The Court:]** Hold on just a second. There's an objection . . . what's the objection?
>
> **[Father's Counsel:]** Well, she was posed as an expert in sexual assault examinations (inaudible). She's testified so far but it's going beyond the (inaudible) started talking about it and it also violates, you know, the issue of ultimate issue.
>
> **[Mother's Counsel:]** Asking if she's -- if she believes them, has a reason to believe them, if they present as if --
>
> **[Father's Counsel:]** She would be giving an opinion as to their credibility.
>
> **[Mother's Counsel:]** I don't see anything wrong with that.
>
> **[The Court:]** Yeah, I think that question falls under [<u>State v. Batangan</u>] so I'm not going to allow it.
>
> **[Mother's Counsel:]** No further questions.

### 3. Psychologist Riggs' Testimony

Mother called another expert witness. Psychologist Dani Riggs testified generally about child sexual abuse. He said that he had reviewed CE Shiner's custody evaluation report, MPD records, "some TROs," the October 29, 2021 CWS Report, a protective order, psychological evaluation of Mother, and

psychosexual evaluation of Father.  Mother's counsel asked whether repeating allegations (as the children did in this case) is a "normal" response.  The court sustained Father's counsel's objection.

> **[Mother's Counsel:]**  Thank you.  Is it your experience that very, very young children would repeat the same thing over and over again in their disclosures?
>
> **[Psychologist Riggs:]**  Yes.
>
> **[Mother's Counsel:]**  Is that suspicious to you or is that what you would consider to be a normal response?
>
> **[Father's Counsel:]**  I'm going to (inaudible).
>
> **[Mother's Counsel:]**  Objection.
>
> **[The Court:]**  Hold on a second.
>
> **[Psychologist Riggs:]**  I'm sorry.
>
> **[Father's Counsel:]** I'm going to renew my objection. There was -- she's trying to back door what has been submitted (inaudible).
>
> **[The Court:]**  Okay.  So [State v. Batangan] says that an expert testimony explaining seemingly bizarre behavior of a child sex abuse victim is helpful.  That opinions on the truthfulness or believability of a child victim report of abuse is of no assistance to the fact finder.
>
> **[Mother's Counsel:]**  Is it no [sic]?
>
> **[The Court:]**  Is of no assistance to the fact finder. So to the extent that Mr. Riggs is explaining seemingly bizarre behavior of a child sex abuse victim, that is permitted, but he is not permitted to render an opinion on truthfulness or believability of the child victim's reported abuse.
>
> . . . .
>
> **[The Court:]**  You can elicit opinion testimony from him that explains seemingly bizarre behavior, but you can't ask him questions that indirectly are seeking opinion of truthfulness or believability.
>
> **[Mother's Counsel:]**  I'm not asking him for truthfulness or believability.  I'm just asking if that's a common --

21

. . . .

> [Mother's Counsel:]  Yeah, I'm asking if this is a normal response, is all --
>
> [The Court:]  Well, so that goes to truthfulness and believability, so he can give an opinion about behavior of child sex abuse victims in general, but he can't give an opinion on truthfulness or believability.  So if you're asking him if in this specific instance if what the children are doing is normal –
>
> [Mother's Counsel:]  (Inaudible) response to trauma.
>
> [The Court:]  It's touching on the truthfulness and believability.  So if you can rephrase the question, it may be appropriate, but I'll have to sustain the objection.

### 4.    SW Armstrong's Testimony

DHS social worker Armstrong testified that she conducted investigations relating to Mother's concerns that Father may be sexually abusing the children and, through these investigations, contributed to the July 8, 2021 and October 29, 2021 CWS reports to the court.  Father's counsel asked whether SW Armstrong believed that Father abused the children.  Counsel also asked her whether she told Father that she believed he had abused the children.  The court sustained *Mother's* objection to both questions under Batangan.

> [Father's Counsel:]  Did you form an opinion at that time whether or not there was any -- at that time whether or not there was any sexual abuse of the children by [Father]?
>
> [Mother's counsel:]  Objection, your Honor; again, it doesn't -- it calls for a conclusion.  It goes beyond her report.
>
> [The Court:]  I will – yeah, I'll sustain that objection because I think that falls within the [State v. Batangan] issue.
>
> [Mother's Counsel:]  Thank you.

22

> . . . .
>
> **[Father's counsel:]** Did you have any conversation with [Father]?
>
> **[SW Armstrong:]** Yes.
>
> **[Father's Counsel:]** And did you convey to him whether or not you believed that there had been any sexual abuse to the children?
>
> **[Mother's Counsel:]** Objection, your Honor.
>
> **[The Court:]** I'm going to sustain that. I still think that that's within the [State v. Batangan] scope.

## 5. Dr. Goldberg's Testimony

Mother called Dr. Goldberg as a fact witness. Dr. Goldberg testified that she provided therapy to the children. Shortly after the start of Dr. Goldberg's direct examination, Father's counsel objected to Dr. Goldberg testifying as to what the children disclosed to her during their therapy sessions, citing Hawai'i Rules of Evidence (HRE) Rule 804(b)(6). Mother didn't quarrel with the 804(b)(6) argument. Rather, she argued that per HRE Rule 803(b)(24), "reliable trusted sources are allowed to speak on behalf of the children that have been abused." The court held that because Dr. Goldberg was not called as an expert, she could only testify "based on her personal knowledge . . . and not as an expert."

> **[Father's Counsel:]** So the rule that I'm referring to is 804(b)(6), a statement made by a child under the age of 16 describing an act of sexual contact or penetration or physical violence (inaudible) performed with or against the child by another if the Court determines the content and circumstances of the statement provide strong assurance of trustworthiness . . . . I don't know. She hasn't provided a foundation for any of those things.

23

> [Mother's Counsel:]  I'm happy to do that, your Honor, if the Court will allow me time.
>
> [The Court:]  Okay.  So I think before we get to that, that foundation will have to be laid.  I was under the impression that experts were previously agreed that experts who testified were experts [sic] but there seems like there might be a disagreement about what Dr. Goldberg was supposed to be an expert on, and so that's also another factor because conceivably, the hearsay that she'd be speaking to would be something that she's basing her expert opinions on.  And so if she's not qualified as an expert in a certain area, she may not be allowed to testify about any of this at all.  So can we first get clarification what Dr. Goldberg is an expert in.
>
> [Mother's Counsel:]  Certainly.  And you're right. That was agreed to by stipulation of the parties.  I apologize, your Honor.  We did not list Dr. Goldberg as an expert.
>
> [The Court:]  Okay.  So then I guess there's no agreement that she's an expert.  <u>What is Dr. Goldberg going to be testifying on?</u>
>
> [Mother's Counsel:]  She'll testify that she provided therapy to the children and their response to that therapy, which included disclosures of sex abuse and more details of sex abuse than from disclosures to other professionals. <u>And as a professional, we would say that she is a trusted reliable source and should be able to repeat what the children said.</u>

(Emphases added.)

The court then allowed Dr. Goldberg to testify as to her observations of the children's physical behavior during therapy, before Father's counsel objected to Dr. Goldberg describing what the children disclosed to her.  Judge Collins sustained Father's objection.  He stated, "I think under [HRE] Rule 803(a)(1), unless the statement is being offered against [Mother], I'm going to have to sustain the objection because otherwise it's inadmissible hearsay."

### 6.    Family Court Order

After trial, on March 28, 2022, the family court issued its "Findings of Fact, Conclusions of Law, Decision and Order" granting sole custody and relocation to Father, and supervised visitation to Mother.  The court made 106 findings of fact (FOFs) and twenty-five conclusions of law (COLs).

FOFs 1 through 53 outlined Mother's and Father's backgrounds and social histories.  Those FOFs described how Mother and Father met in Utah as teenagers, started using drugs, had children at age eighteen, and had entered different rehabilitation programs over the years.  The court made findings regarding the couple's separation, Mother's move to Maui with her parents, and the parties' present residential, employment, and sobriety situations.  It also set forth findings regarding Father's proposed living situation with the children in Utah.

FOFs 65 through 101 detailed Mother's allegations of sexual abuse from April 2021 through the family court proceedings. FOFs 102 and 103 determined that both parents have the potential to relapse, but found that Father has "deeper and clearer insight into his addiction, his present state[, and] his history of drug use."

Last, FOFs 104-106 found that based on clear and convincing evidence, Mother abused court processes by filing multiple TROs that were later denied for insufficient evidence.  (The December

8, 2021 amended protective order was dissolved by the court's decision and order.)

The family court concluded that Father could provide a stable, safe, and wholesome home for the children in Utah. In contrast, Mother was not presently a fit or proper parent who could do the same. Father's relocation plan, the court concluded, "is realistic, credible[,] and sustainable." Last, the court determined, Mother's conduct "demonstrates she is unable to act in the best interest of the minor children and that unsupervised visitation of the children would presently be detrimental to their best interest," and that her "actions demonstrate that either she is unable to separate her needs from the minor children or she is unable to protect the children from her parents' needs and wants."

On April 7, 2022, Mother filed a "Motion for Reconsideration, Clarification and Further Hearing[,]" pursuant to Hawai'i Family Court Rules (HFCR) Rules 59, 60, and 10. The court denied Mother's reconsideration motion.

D.  ICA Proceedings

Mother appealed. She claimed that "Judge Collins erred as a matter of law, and abused his discretion" by (1) dissolving the December 8, 2021 amended protective order, (2) "grant[ing] Father sole custody and relocation to Utah with the children"; and (3) "limit[ing] Mother to supervised visitation of uncertain

time, place and duration."  She also argued that Judge Collins violated Mother's due process rights and fundamental liberty interest in the care, custody, and control of the children by (1) "limiting this case to a two-day trial," (2) "refusing to admit evidence regarding the credibility of the children's disclosures[,]" and (3) precluding testimony and evidence on hearsay grounds.

Father argued that the court did not err in awarding him sole legal and physical custody.  He maintained that Judge Collins' "findings of fact set forth more than a sufficient basis for his conclusions that Father is a fit and proper parent who can provide the children with a stable, wholesome, and safe home."

The ICA affirmed the family court's decision and order, and its reconsideration denial.  It held that the family court did not abuse its discretion in dissolving Judge Heely's amended protective order.

The ICA also held that "the family court did not err in awarding [F]ather sole physical and legal custody, and granting [F]ather permission to relocate and return to the State of Utah with the children.  The family court made sufficient findings and conclusions, based on the record evidence, that this would be in the children's best interest."

**E.    Supreme Court Proceedings**

Mother appealed.  We accepted cert.

First, Mother argues that the court's refusal to admit "critical" trial testimony pursuant to Batangan resulted in an unfair trial and a violation of her due process rights.  Mother claims the court erred by excluding expert and lay testimony relevant to whether sexual abuse happened.  These issues, she maintains, are relevant to the court's custody determination.

Second, Mother asserts that the court erred by precluding hearsay testimony from Dr. Goldberg because HRE Rules 803(b)(24) and 804(b)(6) applied.  She also claims the court erred in refusing to admit into evidence the transcript of Detective Satterfield's interview with Dr. Goldberg.

Last, Mother maintains that the ICA erred in "summarily" affirming the family court's decision to dissolve Judge Heely's amended protective order, grant Father sole custody and relocation to Utah, and limit Mother to supervised visitation based "solely" on her request for said protective orders.  She claims that by allowing Father to relocate the children to Utah and denying Mother unsupervised visitation, the court "intended to remove her from any meaningful role in her children's lives." Mother argued that the findings supporting the court's conclusions were "clearly erroneous."  She insists that the

court based its decision "solely" on her misuse of process in bringing "false allegations of abuse."

We hold that the family court properly precluded witness testimony regarding the credibility of the children's disclosures. Per Batangan, "expert testimony on a witness' credibility is inappropriate" and "conclusory opinions that abuse did occur and that the child victim's report of abuse is truthful and believable . . . should not be admitted." 71 Haw. at 557-58, 799 P.2d at 51-52. The Hawai'i Rules of Evidence govern family court proceedings. See In re ASK, 152 Hawai'i 123, 127, 522 P.3d 270, 274 (2022). Batangan applies. Thus, because Mother's counsel asked the witnesses whether they believed the children - in other words, whether the children's disclosures were credible – the family court properly sustained Father's objections to their testimony.

We also hold that Batangan applies to credibility testimony by non-expert witnesses. See In re Doe, 70 Haw. 32, 35, 40, 761 P.2d 299, 301, 304 (1988). Thus, we conclude that the court did not err in sustaining Father's counsel's objection to fact witness Detective Satterfield's testimony regarding whether he believed the children. See id.; Batangan, 71 Haw. at 558, 799 P.2d at 52.

Second, we hold that the family court did not err in excluding Dr. Goldberg's testimony regarding the children's

29

disclosures during play therapy.  We hold that Mother failed to meet the HRE Rule 804(b)(6) and HRE Rule 803(b)(24) hearsay exception requirements.  And because the transcript of Dr. Goldberg's interview with Detective Satterfield describing the children's disclosures was admitted as an exhibit, even if the court erred, the omission constituted harmless error.  In re Doe, 100 Hawai'i 335, 346 n.23, 60 P.3d 285, 296 n.23 (2002).

Last, Mother's arguments that the court based its decision "solely" on Mother's alleged abuse of process in filing multiple TROs lacks merit.  The court exhaustively detailed its many reasons justifying the custody order.  The court did not "solely" rely on "abuse of process" findings to award Father custody.

We hold that the family court did not abuse its discretion in awarding Father sole custody and allowing him to relocate to Utah with the children.  See HRS § 571-46(b); Fisher v. Fisher, 111 Hawai'i 41, 50, 137 P.3d 355, 364 (2006).  The family court properly considered the relevant HRS § 571-46(b) factors and did not err in concluding that relocation with Father was in the best interest of the children.

The family court's findings and conclusions were supported by sufficient evidence.  First, despite allegations, there was no finding of sexual abuse of the children by Father.  See HRS § 571-46(b)(1) ("Any history of sexual or physical abuse of a

30

child by a parent."). As explained below, evidence supports the family court's following findings. Father has repeatedly denied any sexual touching or abuse of the children. In court, he denied sexually assaulting his son and daughter. Mother initially did not believe Maternal Grandmother's April 2021 reports of sexualized behaviors to CWS, and declined to allow the Children's Justice Center to interview the children. Mother's report of sexual abuse to MPD was initiated ten days after her unsuccessful June 3, 2021 motion for temporary custody. During Mother's interview with MPD, the responding officer reported that Mother changed her statements and acted strangely. She failed to make eye contact, the officer wrote, and "she was observed to be laughing and smiling at times and not upset over the allegations involving her children."

The court further found that CWS did not confirm sexual abuse. CWS was unable to rule out toileting and bathing activities, pinworms causing pain in the buttocks, or exposure to Mother's ex-boyfriends or other family members as the cause of the children's statements. The children did not make any disclosures of sexual or inappropriate sexual touching by Father during their first Children's Justice Center forensic interview. Based on a second CJC interview, where the children disclosed Father touching their privates, CWS was unable to rule out toileting or bathing assistance as the cause of the disclosures

because "[t]he children were not able to expand on [the] disclosures at all."

Regarding the alleged sexualized behavior exhibited by the children, the court found that "[t]here is no evidence that Mother or her family sought to rule out any of the other adults in the children's lives." The record supports that Mother and Maternal Grandmother's reports of post-August 2020 sexualized behavior surfaced shortly after Mother allowed her children to visit with her nearly forty-year-old ex-boyfriend who smoked methamphetamine with Mother, assaulted Mother, and threatened to kill Mother and her children.

Second, the record supports that by constantly interviewing the children and conducting leading interviews of the children regarding sexual abuse, Mother was unable to separate the children's needs from her own. See HRS § 571-46(b)(12) ("Each parent's actions demonstrating that they separate the child's needs from the parent's needs."). Evidence supports the court's finding that Mother coached the children to make statements regarding inappropriate touching by Father. Nearly every professional evaluating the allegations expressed concern that Mother's questioning of her children was suggestive and leading.

SW Reinecke also reported observations that caused her to question Mothers' mental health. SW Reinecke expressed concern about Mother filming and submitting leading videos of her asking

children leading questions about sexual assault. She was also worried about Mother's behavior related to the Children's Justice Center forensic interviews. Mother expressed urgency about the interviews, then canceled the CJC's first interview, and later rescheduled. During the June 29, 2021 interview, Mother nearly canceled the interview when she learned she could not be in the room during the interview. This concerned SW Reinecke.

The record also supports that given Maternal Grandmother's desire to gain custody of the children and her interference with Father's relationship with his children, Mother was unable to protect her children from Mother's parents' needs.

Third, the family court's conclusion that Mother has an underdeveloped understanding of her addiction is supported by evidence of Mother's past drug use, Mother's testimony before the court regarding her drug use, and documentation of Mother's misrepresentation or denial of drug use to a court officer. See HRS § 571-46(b)(13) ("Any evidence of past or current drug or alcohol abuse by a parent."). The evidence supports that Father has better behavioral insight into his sobriety than Mother.

Fourth, in assessing the overall quality of the parent-child relationship between Father and his children, sufficient evidence supports a finding that Father had a healthy

33

relationship with his children.  See HRS § 571-46(b)(3) ("The overall quality of the parent-child relationship.").

Fifth, evidence supports a finding that Father is better equipped to support the physical health needs of the children because Mother neglected to obtain health insurance or regular health care for the children.  See HRS § 571-46(b)(6) ("The physical health needs of the child.").

The children suffered from pinworms.  Yet Mother and Maternal Grandmother did not seek pediatric medical care to treat the children's discomfort.  Upon learning this, SW Reinecke recommended that Mother seek medical care for the children to address the pinworm problem.  She also sought to rule out the pinworms as the source of the children's buttock pain reports.  Mother and Maternal Grandmother ascribe to naturopathic medicine, the evidence suggests, and do not take the children to regular medical visits.

Sixth, the record supports the family court's finding that Mother's accusations harmed the children's connection to their Father.  See HRS § 571-46(b)(11) ("Each parent's actions demonstrating that they allow the child to maintain family connections through family events and activities.").  After Mother accused Father of abuse, Father no longer wanted to visit with his children at maternal grandparents' home.  Father also feared helping his children with their basic needs.  He thought

that helping the children bathe or use the bathroom would lead to more accusations.

Seventh, the record supports the court's holding that Father's relocation plan was "realistic, credible, and sustainable," and in the best interest of the children. Evidence supports a finding that prior to separation from Mother, Father was actively engaged in parenting the children. See HRS § 571-46(b)(4) ("The history of caregiving or parenting by each parent prior and subsequent to a marital or other type of separation."). For two years, after the birth of their first child, Jack, Father and Mother parented together. The reports and testimony indicated that Father has a loving, positive relationship with his children.

As for the proposed Utah move, the court did not err in finding that Father's plan was realistic, credible, and sustainable. Father has significant family support, childcare assistance, and re-employment prospects. Paternal Grandfather offered an apartment type portion of the house for Father and the children to live in, near Paternal Grandmother and Father's siblings' homes. The children were born in Utah, and were familiar with their Utah family members.

Last, we hold that the record supports clear and convincing evidence of Mother's wilful misuse of the protection from abuse process. The family court could reasonably infer from

substantial evidence that it was highly probable that Mother filed the four sets of TROs to gain an advantage in the custody proceedings. See HRS § 571-46(b)(16); Iddings v. Mee-Lee, 82 Hawai'i 1, 13, 919 P.2d 263, 275 (1996); Fisher, 111 Hawai'i at 46, 137 P.3d at 360. Thus, the family court's findings related to misuse of the protection from abuse process were not clearly erroneous, and the court did not abuse its discretion in weighing the HRS § 571-46(b)(16) factor in Father's favor.

Thus, the record supports the family court's holding that awarding Father sole legal and physical custody of the children, granting the relocation request, and awarding Mother supervised visitation serves the best interest of the children. We hold that the court grounded its findings in the HRS § 571-46 factors and based its findings on sufficient evidence. The family court did not abuse its discretion.

Therefore, we hold that the family court (1) did not err in sustaining the challenged objections at trial, and (2) the court did not abuse its discretion in awarding Father sole legal and physical custody and allowing him to relocate with the children to Utah.

**II.**

**A.    The family court did not err in sustaining objections to testimony regarding the credibility of the children's disclosures**

**1.    The court did not err in excluding testimony by Nurse Baumstark, Psychologist Riggs, SW Armstrong, and Detective Satterfield, pursuant to Batangan**

The family court precluded some testimony by expert witnesses Nurse Baumstark, SW Armstrong, and Psychologist Riggs, and fact witness Detective Satterfield. Each time, the court cited Batangan to exclude the witnesses' testimony.

We hold that the family court properly ruled.

"Evidentiary rulings are reviewed for abuse of discretion, unless application of the rule admits of only one correct result, in which case review is under the right/wrong standard." State v. Ortiz, 91 Hawai'i 181, 189, 981 P.2d 1127, 1135 (1999).

As a general rule, witnesses may not testify about another witness' veracity. State v. Maluia, 107 Hawai'i 20, 24, 108 P.3d 974, 978 (2005) ("were-they-lying" questions, are improper, among other things, because they encroach on the jury's credibility assessments, and they "are argumentative and have no probative value"). Witness testimony about the credibility of another's specific statements, words spoken by that person inside or outside the courtroom, lack probative value. See id.

37

Batangan addressed the admissibility of expert opinion testimony regarding the credibility of witnesses under HRE Rule 702. Per HRE 702, expert opinion testimony is admissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" and when the witness is "qualified as an expert by knowledge, skill, experience, training, or education." HRE Rule 702.

Defendant Batangan was accused of sexually abusing his daughter when she was six or seven years old. Batangan, 71 Haw. at 554, 799 P.2d at 50. At trial, the State presented the testimony of "an expert witness in the field of clinical psychology with a subspecialty in the treatment of sexually abused children." Id. at 554-55, 799 P.2d at 50. The expert opined on the child's credibility based on his evaluation of the child, and the "behavior of child sex abuse victims in general." Id. at 555, 799 P.2d at 50. He "testified as to how he evaluates whether a child is telling the truth about being sexually abused" and "then implicitly testified that [the] [c]omplainant was believable and that she had been abused by [Batangan]." Id.

This court vacated Batangan's conviction and remanded for a new trial. Id. at 562, 799 P.2d at 54. The trial court had erred in admitting the expert's testimony because "expert

38

testimony on a witness' credibility is inappropriate" and unhelpful to the jury because such cases usually have only "the victim's accusation and the defendant's denial," such that testimony about who to believe "is nothing more than advice to jurors on how to decide the case." Id. at 556-57, 559, 799 P.2d at 51-52. Grounding its decision on the rules of evidence, Batangan held that "[t]he pertinent consideration is whether the expert testimony will assist the jury without unduly prejudicing the defendant." Id. at 558, 799 P.2d at 52.

The court explained that while expert testimony may explain an alleged child victim's behavior, conclusory opinions about the truthfulness or believability of the alleged victim based on that behavior is inadmissible:

> [W]hile expert testimony explaining "seemingly bizarre" behavior of child sexual abuse victims is helpful to the jury and should be admitted, conclusory opinions that abuse did occur and that the child victim's report of abuse is truthful and believable is of no assistance to the jury, and therefore, should not be admitted.

Id. Batangan stressed that where "the expert's opinion is the same as directly opining on the truthfulness of the complaining witness, . . . such testimony invades the province of the jury." Id. at 559, 799 P.2d at 52 (cleaned up).

That Batangan was a criminal sexual assault case does not change how the rules of evidence operate in family court. We recognize the broad scope of information considered in family court proceedings. See In re Doe, 109 Hawai'i 399, 411, 126 P.3d

39

1086, 1098 (2006) ("Where the best interests of a child is of paramount importance, consideration of all relevant evidence becomes a critical duty of the court in making a decision regarding custody and visitation.").

In re ASK held, though, that while the best interest factors under HRS § 571-46(b) allow "other relevant evidence," the rules of evidence still "confine the family court." 152 Hawai'i at 127, 522 P.3d at 274. We also held that "within this typical [family court] trial framework, there are no statutory presumptions, no 'super-factors,' and no evidence that deserves automatic preferential treatment." Id.

We hold that the family court did not err in excluding Nurse Baumstark and Psychologist Riggs' expert testimony as to whether the children were credible. Per Batangan, HRE Rule 702 precludes this type of expert testimony. 71 Haw. at 559, 799 P.2d at 52. While "expert testimony explaining 'seemingly bizarre' behavior of child sex abuse victims is helpful to the [fact-finder] and should be admitted, conclusory opinions that abuse did occur and that the child victim's report of abuse is truthful and believable is of no assistance to the [fact-finder], and therefore, should not be admitted." Id.

Mother's counsel asked expert witness Nurse Baumstark, "[D]o you have any reason not to believe this child when he told you what his father did?" Because Mother's counsel asked Nurse

40

Baumstark directly whether she believed Jack, this testimony is inadmissible per HRE Rule 702 and Batangan. See 71 Haw. at 559, 799 P.2d at 52. The court did not err in excluding Nurse Baumstark's testimony on Jack's credibility. See id.

The family court also properly excluded the credibility questions Mother posed to expert witness Psychologist Riggs. Mother's counsel asked Psychologist Riggs: "Is it your experience that very, very young children would repeat the same thing over and over again in their disclosures?" Riggs responded, "Yes." Standing alone, Psychologist Riggs's testimony that "very, very young children . . . repeat the same thing over and over again in their disclosures," appears to explain the children's "seemingly bizarre" behavior, and is admissible. See id. Father also did not object to this statement.

Mother then asked Psychologist Riggs, "Is that suspicious to you or is that what you would consider to be a normal response?" Father objected. We hold that the court properly sustained his objection. Asking whether that behavior is a "normal" or "suspicious" prompted Riggs to opine on whether the children were believable. See id. Thus, we hold that the family court properly excluded Psychologist Riggs' testimony regarding the children's credibility. See id.

Detective Satterfield and SW Armstrong were not classified as expert witnesses, and thus served as fact witnesses. We hold that Batangan also applies to credibility testimony by non-expert witnesses.

In re Doe held that the family court erred in admitting a teacher's lay opinion evidence that the complaining witness child "wasn't lying" about sexual abuse by a juvenile defendant. 70 Haw. at 35, 40, 761 P.2d at 301, 304. The prosecution elicited the teacher's testimony to bolster the veracity of a hearsay statement regarding what the child had said. Id. at 40, 761 P.2d at 304. The court held that the family court should not have admitted the teacher's lay opinion. Id.

In re Doe distinguished its facts from State v. Kim, 64 Haw. 598, 645 P.2d 1330 (1982), where defense counsel had cast doubt on a thirteen-year-old complaining witness' credibility during cross-examination. It noted that State v. Castro, 69 Haw. 633, 756 P.2d 1033 (1988) held that "[if State v. Kim] is perceived as precedent for the allowance generally of expert testimony on credibility, the perception is erroneous." In re Doe, 70 Haw. at 40, 761 P.2d at 304. "And obviously," the court said, "Kim does not stand for the proposition that lay testimony on credibility is generally allowed." Id.

Thus, we hold that lay testimony regarding a child's credibility regarding sexual assault allegations is generally

inadmissible.  See id.; see also State v. Ryan, 112 Hawaiʻi 136, 140, 144 P.3d 584, 588 (App. 2006) ("[I]t is generally improper for a witness to express an opinion on the truthfulness of a complaining witness's allegations.").  And to repeat, the evidentiary rules apply with equal force in family court.  In re ASK, 152 Hawaiʻi at 127, 522 P.3d at 274.

Here, the family court did not err in precluding SW Armstrong's non-expert testimony regarding the children's credibility.  Mother actually objected to SW Armstrong's testimony.  Yet Mother now challenges the family court's exclusion of Armstrong's testimony.  After urging the court to keep evidence out, Mother cannot argue the court should've allowed the testimony.  In any event, because Father's counsel asked Armstrong if she believed that the children were abused based on her review of CJC forensic interviews, the family court properly excluded the testimony.  See Batangan, 71 Haw. at 559, 799 P.2d at 52.

Last, we hold that the court did not err in excluding fact witness Detective Satterfield's testimony.  Mother's counsel asked Detective Satterfield, "So do you believe these children were sexually abused?"  Because Mother's counsel asked Detective Satterfield if he believed the children's disclosures, we hold that the family court properly sustained Father's counsel's

43

objection to this testimony per Batangan.  71 Haw. at 559, 799 P.2d at 52.

Even if the court had erred in excluding these expert and fact witness' opinions regarding the children's credibility, we hold that exclusion of their testimony constitutes harmless error.  The credibility of the children is ultimately within the province of the fact-finder.  See In re Doe, 95 Hawai'i 183, 190, 20 P.3d 616, 623 (2001).  The witness' opinion on the credibility of the children does not aid the fact-finder in reaching their independent credibility determination – especially a judge conducting a bench trial.  Witnesses opining on the credibility of in-court or out-of-court statements by others invades the fact-finder's role in our justice system. Thus, we hold that the exclusion of this opinion testimony, even if in error, was harmless.

> **2.  The family court did not err in excluding fact witness Dr. Goldberg's testimony regarding her interview with the children**

Mother argues that the family court erred in sustaining Father's hearsay objections to Dr. Goldberg's testimony regarding statements by the children during play therapy. We hold that the court did not err in excluding Dr. Goldberg's testimony.  Even if it had, the error was harmless.

Mother called Dr. Goldberg as a fact witness.  At trial, Mother asked Dr. Goldberg to testify as to what she observed

while providing therapy to the children.  Father objected to any observations regarding statements the children made as hearsay, but did not object to "visual observations."

Mother cited the HRE Rule 803(b)(24) hearsay exception. She stated "[i]t's well established that reliable trusted sources are allowed to speak on behalf of the children that have been abused."

HRE Rule 803(b)(24) is a catch-all provision for available declarants that allows statements with "equivalent circumstantial guarantees of trustworthiness" if the court determines that "(A) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, and (B) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence."  HRE Rule 803(b)(24).  A statement is only admissible under this exception if the proponent makes the statement known to the adverse party in advance of trial, provides the adverse party "with a fair opportunity to prepare to meet it," and gives advance notice of "the proponent's intention to offer the statement and the particulars of it[.]"  Id.

Father argued that the pertinent evidentiary rule was HRE 804(b)(6).  That rule applies to unavailable declarant children under age sixteen who describe sexual contact or physical

45

violence by another. HRE Rule 804(b)(6). The rule requires "strong assurances of trustworthiness." HRE Rule 804(b)(6). Courts may examine, but are not limited to, factors such as the age and mental condition of the declarant, spontaneity and absence of suggestion, appropriateness of the language and terminology of the statement given the child's age, and lack of motive to fabricate. Id.

The court sustained Father's objection that because Mother listed Dr. Goldberg as a fact witness, Father lacked sufficient notice that Dr. Goldberg would be called as an expert witness. The court allowed Mother to question Dr. Goldberg as a fact witness - "based on her personal knowledge and not as an expert."

The appellate court applies the "right/wrong" standard of review to questions pertaining to hearsay and hearsay exceptions. Ortiz, 91 Hawai'i at 189-90, 981 P.2d at 1135-36.

The court properly excluded Dr. Goldberg's testimony. We note that the family court's cited rule, HRE 803(a)(1), did not apply to the evidentiary scenario at hand. The proffered testimony involved a party's child, not a party-opponent. Even so, we hold that because Mother failed to provide adequate pre-trial notice and did not lay a foundation for "equivalent circumstantial guarantees of trustworthiness" under HRE Rule

803(b)(24), the court properly excluded the testimony regarding the children's declarations.

It is undisputed that Dr. Goldberg's testimony involves hearsay: out-of-court statements (the children's disclosures) offered to prove the truth of the matter asserted (sex abuse). See HRE Rule 802. Because Mother did not lay the proper foundation for any hearsay exception, we hold that the court properly excluded Dr. Goldberg's testimony regarding the children's disclosures.

First, Mother failed to meet the procedural requirements of HRE Rule 803(b)(24). See State v. Anger, 105 Hawai'i 423, 432 n.12, 98 P.3d 630, 639 n.12 (2004). Per HRE Rule 803(b)(24), a party proffering a hearsay statement must "provide [the defense] notice of its intention to employ the hearsay statement, including the name and address of the declarant." Id. If the party provides sufficient pre-trial or pre-hearing notice, the evidence "having equivalent circumstantial guarantees of trustworthiness" may be admitted if "the court determines that (A) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, and (B) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence." HRE Rule 803(b)(24).

While the purpose of the rule is to allow "a measure of controlled flexibility in the judicial determination of what evidence should be admissible under [HRE Rule 803] hearsay exceptions[] . . . [t]he exception is not designed to open the door widely for otherwise inadmissible evidence[.]" HRE Rule 803 cmt. Thus, "the requirement for prior notification to the adverse party provides a protection against both excessive liberalization [of this rule] and unfair surprise." Id.

In Anger, the prosecution failed to meet the HRE Rule 803(b)(24) prior notification requirement. 105 Hawaiʻi at 432 n.12, 98 P.3d at 639 n.12. The prosecution called a police officer to testify about a physician's statement to the officer. Id. But because the prosecution failed to notify the defendant that the officer would testify about the physician's statement, the court held, the notice requirement was not met. Id. The hearsay was inadmissible. Id.

Here, Mother was required to provide Father with notice of the statement regarding the children's disclosures in advance of trial, and to provide Father "with a fair opportunity to prepare to meet it." HRE Rule 803(b)(24). Mother didn't. She listed "Margaret Goldberg" as a fact witness, but did not list Dr. Goldberg's credentials or the scope of her testimony. Thus, we hold that the family court did not err in sustaining Father's objection to Dr. Goldberg's hearsay testimony.

48

We also hold that even if Mother had complied with the notice requirement, she failed to satisfy HRE 803(b)(24)'s other conditions.  The hearsay did not have "equivalent circumstantial guarantees of trustworthiness."  See HRE Rule 803(b)(24).  The children's statements made to Dr. Goldberg were not "more probative on the point for which [they were] offered" than any other evidence Mother procured, and the "interests of justice" would not be served by admission of the statements into evidence.  Id.

First, Mother's counsel conflated Dr. Goldberg's trustworthiness with the "guarantees of trustworthiness" of the declarant's statements.  When given the chance to lay a foundation, Mother's counsel only stated that Dr. Goldberg is a "professional," and a "trusted reliable source."  Mother's counsel did not tell the court why the declarant children's statements *themselves* possessed "equivalent circumstantial guarantees of trustworthiness."  See HRE Rule 803(b)(24); State v. Austin, 143 Hawai'i 18, 35, 422 P.3d 18, 35 (2018) (no "circumstantial guarantees of trustworthiness" when the witness was unable to provide enough detail to the sketch artist, the witness' own sketch was devoid of any detail, and the sketch was the product of a "feeling" that compelled the witness to draw the sketch).

The children were ages three and five when they made their statements. Nurse Baumstark and CE Shiner reported that the children were too young to be interviewed. Dr. Goldberg told Detective Satterfield that their speech was "hard to understand." By the time the children made disclosures to Dr. Goldberg, they had already undergone multiple interviews and meetings with professionals regarding alleged sexual assault by Father: the June 29, 2021 CJC interview, an emergency room visit where Mother requested sexual assault examinations, examinations by Nurse Baumstark involving physical and verbal interviews, and a court custody evaluator visit with the children. Mother had also filmed herself only two months before the disclosures "leading" the children to allege abuse by Father. The children also continuously lived with Mother and Maternal Grandmother after Maternal Grandmother contacted CWS in April 2021, and Mother reported alleged abuse to MPD in June 2021. Thus, the circumstances reveal influence and suggestibility by Mother, and therefore, the declarations lack guarantees of trustworthiness justifying admission. See HRE Rule 803(b)(24).

Second, the children's statements were not "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." See HRE Rule 803(b)(24). Mother's counsel alleged that Dr. Goldberg's testimony would provide "more details of sex abuse

than from disclosures to other professionals."  Mother's counsel did not establish why the proffered evidence would be "more probative" as to whether Father assaulted the children than the considerable evidence already received.  The record includes substantial evidence regarding the children's disclosures that Father touched their private parts.  The hazy proffer of "more details of sex abuse" was offered to boost the veracity of the children's alleged statements.  Because of the children's young ages, and because significant evidence already suggested Mother coached the children, though, we conclude that this evidence would not be more probative than existing evidence.  Thus, we conclude that the evidence offered slim probative value compared to the ample evidence already procured by Mother.  See HRE Rule 803(b)(24).

Last, the hearsay was cumulative.  Admitting testimony about the children's disclosures would not serve the "interests of justice" because the parties already stipulated to pages of evidence concerning the children's disclosures.  The disclosures alleged by Mother (and at times witnessed by reporters) are documented in admitted reports by the sexual assault nurse examiner, CWS social workers, court-appointed supervised visit monitor, court-appointed custody evaluator, and Maui Police Department reports.  The CJC interviews where the children made disclosures were admitted as evidence and reviewed by the court.

The parties also stipulated to admission of documents that included Detective Satterfield's interview with Dr. Goldberg where she discussed the disclosures.  Because the record is stuffed with descriptions of the children's disclosures, we hold that the interests of justice did not require admission of Dr. Goldberg's testimony.  See HRE Rule 803(b)(24).

In sum, we conclude that because Mother failed to meet the notice requirement, the court did not err in excluding Dr. Goldberg's testimony.  We also conclude that even if Mother had followed the evidence rule, the children's statements did not demonstrate "equivalent circumstantial guarantees of trustworthiness," and HRE Rule 803(b)(24)'s other conditions.

The court also did not err in sustaining Father's objection under HRE Rule 804(b)(6).  Mother did not try to lay a foundation under HRE Rule 804(b)(6) even though she said she would.  Mother argues in her cert application that she also cited HRE Rule 804(b)(6).  In fact, Father raised HRE Rule 804(b)(6) during the exchange with the court.  Mother's counsel responded to Father's statement that "[s]he hasn't provided a foundation for any of those things [under HRE Rule 804(b)(6)]" with, "I'm happy to do that, your Honor, if the Court will allow me time."  However, when granted the opportunity to establish a foundation, Mother's counsel mentioned Goldberg's trustworthiness.  Counsel stated that "as a professional, we

would say that [Dr. Goldberg] is a trusted reliable source and should be able to repeat what the children said." This thin foundation hardly references the multiple requirements and factors under HRE Rule 804(b)(6)'s preconditions for admissibility.

The legislature added the HRE Rule 804(b)(6) hearsay exception for child declarants in 1993. See 1993 Haw. Sess. Laws Act 198, § 1, at 304. "Explicit in [HRE 804(b)(6)] . . . is the threshold requirement of showing a declarant's unavailability[.]" State v. Apilando, 79 Hawai'i 128, 141, 900 P.2d 135, 148 (1995). "[It] also provides that a child's statement is admissible only 'if the court determines that the time, content, and circumstances of the statement provide strong assurances of trustworthiness.'" Id. (quoting HRE 804(b)(6)). The rule's supplemental commentary explains that the Hawai'i Supreme Court's Final Report of the Committee on Hawai'i Rules of Evidence emphasized the importance of a showing of unavailability, followed by "strong assurances of trustworthiness."

> What is needed is a hearsay exception that will provide sufficient safeguards to allow for receipt of reliable hearsay statements in cases where child declarants become "unavailable" through inability to remember or to communicate. . . . The committee has carefully constructed proposed Rule 804(b)(6) with Justice O'Connor's Idaho v. Wright [497 U.S. 805 (1990)] analysis in mind. We have specified the relevant circumstances . . . and have articulated the bottom-line reliability criterion: "[T]hat the time, content, and circumstances of the statement provide strong assurances of trustworthiness."

HRE Rule 804 supp. cmt. (quoting Hawai'i Supreme Court, Final Report of the Committee on Hawai'i Rules of Evidence 37-38 (1991)).

Here, Mother did not establish Jack's unavailability with regard to Dr. Goldberg's testimony. See HRE Rule 804(b)(6). We acknowledge that unavailability does not have the same constitutional connotations in a family court proceeding as it does during a criminal trial. See Apilando, 79 Hawai'i at 141, 900 P.2d at 148 (allowing hearsay testimony when a declarant is available violates a defendant's right to confrontation). Because Jack was around age six and Grace was around age four at the time of trial, they were likely unavailable. See HRE Rule 601.

Still, because Mother made no attempt to establish any of the other HRE 804(b)(6) requirements, we hold that Mother did not satisfy HRE Rule 804(b)(6). Mother did not lay a foundation for why the children's age and mental condition, the appropriateness of the terminology used, or the time between the alleged assault and the declarations, for example, produced "strong assurances of trustworthiness." See HRE Rule 804(b)(6).

In her interview with Detective Satterfield, Dr. Goldberg confirmed the disclosures, noting that for both children, "[w]e were building [with toys] and [the disclosure] kind of came out

of nowhere." Jack stated that Father put his finger in his butt, and Grace said that Father put his finger in her butt and vagina. Dr. Goldberg said she asked Jack if it hurt (he said "yes"), and whether it was a long time ago (he said "no"), then "left it." She only asked Grace if it hurt (yes), and again "left it." During the police interview, Dr. Goldberg did not describe anything else about the disclosures, such as information about when or where the alleged abuse occurred.

Mother brought the children to Dr. Goldberg at her attorney's recommendation. Dr. Goldberg also told Detective Satterfield that she asked Mother if she had told the children what to tell her during therapy. Dr. Goldberg reported she "was kind of worried about that." Mother told Dr. Goldberg that she only told the children "they could tell [Dr. Golberg] anything," but that she didn't tell them what to say.

Under the circumstances, the statements by children do not have HRE Rule 804(b)(6)'s "strong assurances of trustworthiness." The record suggests that Mother induced the children to make disclosures. Since Mother made the children participate in videos that informed others about instances of sexual assault, and Mother and her parents questioned the children about sexual abuse throughout the hotly-contested proceedings, there may be suggestibility. See HRE Rule 804(b)(6). As a result, the young children may have felt

55

pressure to describe sexual assault.  See id.  That Dr. Goldberg felt she had to ask whether Mother coached the children also decreases the trustworthiness of these statements.

Even if the statements were made seemingly spontaneously to Dr. Goldberg during play therapy (which Mother did not expressly assert at trial), Mother did not argue that the children's young ages or developmental capacity supported the reliability of those statements, or that Jack fully understood temporal concepts like recency to answer Dr. Goldberg's questions accurately.

Further, the consistent questioning of the children throughout these proceedings erodes the trustworthiness of these late-in-the-game "spontaneous" disclosures.  To repeat, by the time the children made disclosures to Dr. Goldberg, they had already undergone multiple interviews and visits with professionals.  These included a CJC interview, an emergency room visit where Mother requested sexual assault examinations, examinations by Nurse Baumstark involving physical examination of the children's privates, and a court custody evaluator visit with the children.  The clear emphasis on the children "sharing" specific types of information with professionals again decreases the trustworthiness of the children's statements made to Dr. Goldberg.  See HRE Rule 804(b)(6).

56

Thus, under the entire circumstances and the evidence presented to the court at trial, we conclude that the family court properly determined that the hearsay statements do not have "*strong* assurances of trustworthiness."  See HRE Rule 804(b)(6) (emphasis added).

We hold that the court did not err in excluding Dr. Goldberg's testimony regarding the disclosures per HRE Rule 804(b)(6).

Last, we hold that even if the family court had erred, the omission of Dr. Goldberg's testimony constituted harmless error. In re Doe held that "[t]he exclusion of testimony is harmless where the same evidence is established through other means." 100 Hawai'i at 346 n.23, 60 P.3d at 296 n.23.  Dr. Goldberg's interview with Detective Satterfield regarding the children's disclosures to her was admitted into evidence as part of Exhibit 2.  The parties stipulated to admission of that exhibit.  And as mentioned, there was substantial evidence already before the court regarding the children's disclosures.  Thus, we hold that omission of Dr. Goldberg's testimony regarding the children's disclosures constitutes harmless error.  See id.

**B.  The family court did not abuse its discretion in awarding sole legal and physical custody to Father and allowing Father to return to Utah with the children**

We hold that the family court did not abuse its

57

discretion by concluding that the children's placement with Father in Utah served the best interest of the children.

The family court possesses wide discretion, and its decisions are evaluated under the "abuse of discretion" standard.  DJ v. CJ, 147 Hawai'i 2, 17 n.16, 464 P.3d 790, 805 n.16 (2020) (Despite the "great deference" granted to family courts in making custody decisions and in determining the bests interests of the child, "[t]he applicable standard of review is still 'abuse of discretion.'").

Family courts are tasked with making tough decisions regarding evidence, credibility, and the best interest of the child.  Judges make these calls after eyeballing and listening to witnesses.  Credibility determinations are for the trial court, not appellate courts reading transcripts away from the live give-and-take action of the courtroom.  See In re Doe, 95 Hawai'i at 190, 20 P.3d at 623.  Fact-intensive, on-the-ground decisions are not generally second guessed on appeal.

"It is well established that a family court abuses its discretion where '(1) the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant; (2) the family court failed to exercise its equitable discretion; or (3) the family court's decision clearly exceeds the bounds of reason.'"  Kakinami v. Kakinami, 127 Hawai'i 126, 155-56, 276 P.3d 695, 724-25 (2012) (Acoba, J.,

concurring and dissenting).  Further, "[i]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact."  In re Doe, 95 Hawai'i at 190, 20 P.3d at 623.

A family court's findings of fact are reviewed under the "clearly erroneous" standard.  Fisher, 111 Hawai'i at 46, 137 P.3d at 360.  "A FOF is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. 'Substantial evidence' is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion."  Id.

"Hawai'i courts have consistently adhered to the best interests of the child standard as paramount when considering the issue of custody."  Id. at 50, 137 P.3d at 364.  HRS § 571-46(b) provides sixteen factors the court must consider in determining the best interests of a child.  HRS § 571-46(b).  Factors relevant to this case include: (1) Any history of sexual or physical abuse of a child by a parent (HRS § 571-46(b)(1)); (2) The overall quality of the parent-child relationship (HRS § 571-46(b)(3)); (3) The history of caregiving or parenting by

each parent prior and subsequent to a marital or other type of separation (HRS § 571-46(b)(4)); (4) The physical health needs of the child (HRS § 571-46(b)(6)); (5) Each parent's actions demonstrating that they allow the child to maintain family connections through family events and activities (HRS § 571-46(b)(11)); (6) Each parent's actions demonstrating that they separate the child's needs from the parent's needs (HRS § 571-46(b)(12)); and (7) Any evidence of past or current drug or alcohol abuse by a parent (HRS § 571-46(b)(13)).

In assessing these factors, "the family court is granted broad discretion to weigh the various factors involved, with no single factor being given presumptive paramount weight, in determining whether the standard has been met."  Fisher, 111 Hawai'i at 50, 137 P.3d at 364.  The court is also not limited to the factors enumerated in HRS § 571-46(b).  HRS § 571-46(b) ("the court shall consider, but not be limited to, the following [HRS § 571-46(b) factors]").

In its conclusions of law, the family court listed all sixteen of the HRS § 571-46(b) best interest of the child factors.  The court did not expressly cite these factors in its FOFs, or describe in detail which HRS § 571-46(b) factors supported each FOF.  But our review of the record shows that the court sufficiently assessed the statutory factors.

Because we review the family court's custody order for abuse of discretion, as long as we can track its decision-making, we do not require a family court to take a hyper-technical or artificial approach and match each FOF and COL with a HRS § 571-46(b) factor. As Fisher held, "the family court is given much leeway in its examination of the reports concerning a child's care, custody, and welfare, and its conclusions in this regard, if supported by the record and not clearly erroneous, must stand on appeal." 111 Hawai'i at 46, 137 P.3d at 360.

We hold that the FOFs and COLs clearly support a proper evaluation of HRS § 571-46(b)'s factors. Thus, the family court did not abuse its discretion in awarding Father sole custody and allowing him to move with the children back to Utah.

The family court concluded:

> 21. Father is a fit and proper parent who can provide a stable, safe and wholesome home for the minor children in Utah.
>
> 22. Mother is not present[ly] a fit or proper parent who can provide a stable, safe and wholesome home for the minor children.
>
> 23. Father's relocation plan is realistic, credible and sustainable.
>
> 24. Mother's conduct demonstrates she is unable to act in the best interest of the minor children and that unsupervised visitation of the children would presently be detrimental to their best interest.
>
> 25. Mother's actions demonstrate that either she is unable to separate her needs from the minor children or she is unable to protect the children from her parents' needs and wants.

Consequently, the court granted Father sole custody and allowed him to relocate with the children:

> (1)  that Father have sole legal and physical custody of the minor children,
>
> (2)  that Father and minor children be permitted to relocate and return to the State of Utah, provided that he shall notify the Court and Mother within thirty days of this order if Father and the minor children will not be relocating and returning to the State of Utah,
>
> (3)  that Mother have reasonable supervised visitation with the children – in person or through telephone, computer videotelephony or other reasonable means – as agreed upon by the parties, or as further ordered by the Court.
>
> . . . .
>
> (6)  That the Amended Order for Protection filed December 8, 2021 in [Mother] obo Minor Child v. [Father], FC-DA No. 21-1-0510 be dissolved, and
>
> (7)  That each party shall be responsible for his or her own costs and attorney's fees.

We hold that the family court properly ruled.  The court's extensive findings support its conclusion that Father's custody and relocation serves the best interest of Jack and Grace. Thus, the court did not abuse its discretion.

**1.  The record supports the family court's findings that there was no confirmed sexual abuse by Father**

The record supports the family court's finding that Father did not sexually abuse his children.  The family court's findings thus support that per HRS § 571-46(b)(1) ("[a]ny history of sexual or physical abuse of a child by a parent"), Mother's sexual abuse accusations against Father do not weigh against Father's custody of the children.

62

Father has always denied any sexual touching or abuse of his children - to social workers, the police, anyone who asked. He also testified at trial that he has never sexually assaulted his children. While not saying so explicitly, the family court's disposition implicitly found Father credible.

Mother informed CWS that she initially did not believe that Father had abused the children. After Maternal Grandmother filed a report with CWS, Mother acknowledged that she told SW Armstrong that she "felt her mom had 'jumped the gun' and she had no concerns regarding [Father's] care of them. Mother was offered CJC interviews for [the children] as well as services but she declined."

Mother first began alleging sexual abuse after the court did not rule in her favor. On June 3, 2021, the family court declined to award Mother sole legal and physical custody. Ten days later, on June 13, 2021, Mother called the Maui Police Department and claimed that the children were "sexually assaulted by their father" two months before, in April 2021.

Mother's interview with Maui police was odd. The officer reported that Mother changed her statements over the course of the interview, laughed inappropriately, and failed to make eye contact.

Two hours later, after the police had alerted him to the accusation, Father waived his constitutional rights and was

questioned by the police. He denied sexually touching his children.

The children initially made no disclosures. On June 29, 2021, the Children's Justice Center interviewed the children, but neither child disclosed instances of sexual abuse.

The family court remarked in FOF 90 that it had reviewed the video recordings of both CJC interviews. The court placed on the record that there were no disclosures in those interviews pertaining to inappropriate sexual touching by Father. According to SW Reinecke's report, Grace's "speech [during the interview] was mostly ineligible[,] [sic] making her statements difficult to understand."

> She talked about taking baths, sleeping with her daddy and playing; not in any specified order. Of pertinence was Grace's statement "daddy help when go poop . . . wipe butt; my butt hurt". She is wiped with "paper". Asked who does she sleep with she responded "daddy". Who live with? She responded "daddy". Asked who she showers with, she responded "daddy and Jack."

The family court had also ordered the Department of Human Services to investigate the allegations. CWS' July 2021 report to the court found neither sexual abuse nor a threat of sexual abuse by Father.

As the proceedings progressed, Mother appeared to prompt the children to make disclosures. The CWS report stated that Mother claimed she had "various audio and video recording of kids making statements about what their dad did sexually to

them.  [Mother] stated because of the kids' ages, information comes out in bits.  It was difficult for her to get it out of Jack but Grace told her 'daddy touched my butt' and Grace showed her finger inserting anus and vagina.  That both kids were crying saying their butts hurt."  Per CWS, two videos given to CWS by Mother were "difficult to understand."  And they were "highly suggestible and leading."  SW Reinecke stated she "observed Jack saying 'they trust teenagers'" and "[Mother] saying to child 'cops don't believe kids, they only believe[] adults.'"

CWS did not confirm actual abuse or the threat of abuse by Father.  CWS reported that there was "too much ambiguity" as to whether the children were abused, partly because "[t]he children have also been exposed to Mother's boyfriends, of whom no information is given with exception that there ha[s] been exposure to domestic violence."  As for other potential causes, CWS stated that Maternal Grandmother acknowledged that the children had pinworms, but that they were only treated with over-the-counter medication.  CWS recommended the children undergo medical physicals, and have the "pinworm issue[] verified and treated."  CWS social worker Reinecke later testified during trial that she thought the pinworms "would impact [the children] digging their butts," so she recommended medical attention to rule out natural health issues.

Last, while a subsequent October 29, 2021 report did confirm the *threat* of sexual abuse by Father, CWS clarified that threat of sex abuse only means "a *possibility* of that harm happening." "[A]ctual abuse is that it actually occurred, that we have evidence to confirm actual sex abuse." When asked whether the term "threat" was a synonym for a "possibility" of sex abuse, Armstrong explained, "there is the threat that [Father] may have or may in the future abuse his children in a sexual manner, so that's the threat. But we have no proof that he actually did anything so I can't confirm sex abuse." (Emphasis added.)

We hold that the record supports the court's conclusion that there was no evidence of abuse by Father. We also hold that while the court did not expressly reference HRS § 571-46(b)(1) as applied to these facts, it is clear that the court considered this factor at length – nearly forty findings of fact. Thus, the court did not err.

**2. The court did not err in concluding that Mother is unable to separate her children's needs from both Mother's and Mother's parents' needs**

The record reveals that the court did not abuse its discretion in concluding that "Mother's actions demonstrate that either she is unable to separate her needs from the minor children or she is unable to protect the children from her parents' needs and wants." The family court's conclusion that

66

Mother is unable to separate her needs (and her own parents' needs) from her children's needs shows that the court considered HRS § 571-46(b)(12) – "[e]ach parent's actions demonstrating that they separate the child's needs from the parent's needs." HRS § 571-46(b)(12).  This conclusion is supported by the court's findings and the record, and thus, the family court did not abuse its discretion.

The court found that "[t]here is substantial, credible evidence that Mother has coached the minor children to make statements regarding inappropriate touching by Father which when reported to third parties would lead a reasonable person to believe that Father had sexually abused the children even where he had not."  It also found that CWS reported that Mother's recordings of her questioning the children was "highly suggestive and leading."  The court concluded that "Mother's actions demonstrate that either she is unable to separate her needs from the minor children or she is unable to protect the children from her parents' needs and wants."

The evidence shows that the videos Mother filmed were leading or created only to boost Mother's allegations.  The dubious nature of Mother's recordings caused law enforcement, the custody evaluator, and social workers to express concern.  CWS social worker Reinecke testified that the questions Mother posed to children in the videos Mother submitted to CWS were

"leading" and "not neutral." In August 2021, Detective Satterfield reported that Mother sent him seven videos of Mother interviewing the children. The detective warned Mother to stop taking videos and interviewing the children on her own. She was directed not to send more videos. Custody evaluator Shiner also reported that SW Reinecke told her that she "wonder[s] about [Mother's] mental health. In the videos and audios that she submitted, she's extremely leading."

Father had concerns of his own. SW Armstrong stated in her report that "[Father] is concerned that someone might be touching his kids and reporting that it is him" and that "the children may be being coached."

Evidence also suggests that because the children's disclosures to Dr. Goldberg "came out of nowhere," the children were told to make those statements during therapy. Dr. Goldberg told Detective Satterfield that for both children, "[w]e were building and it kind of came out of nowhere."

Further, the court found that "Dr. Goldberg expressed concern, during cross-examination, that Mother had attempted to direct Dr. Goldberg to do things that Dr. Goldberg did not agree to do and that Mother had a tendency to say inappropriate things at times." Dr. Goldberg had reported to Detective Satterfield that Mother "seems to sometimes think that she knows what people should do, like me and tell me what to do and I don't like

that."  She also reported that Mother "just seems to say the wrong thing at certain times and um and I don't know.  I can't quite put my finger on it."  On cross-examination, Dr. Goldberg confirmed her statements.  Dr. Goldberg's allusion to Mother telling a professional what conclusions to reach, or what action to take, supports the court's conclusion that Mother coached the minor children to make certain statements to Dr. Goldberg.

The record also supports that the children may have been coached to disclose specific statements to their supervised visit monitor, Ms. Przeciechowska.  During a supervised visit in November 2021, "[t]he monitor asked [the children] if they were comfortable during the visit.  Both children said 'yes,' and Grace commented: 'Dada touched my butt.'  The monitor asked the child if this happened today during the visit, and the child said, 'at the farm.'"  On December 18, 2021, "[w]hile the monitor and the children were waiting for the father's arrival, Grace said her 'Dada' touched her butt yesterday.  Jack, who overheard his sister's statement, commented, 'No, at the farm.'"  Last, on December 22, 2021, "[w]hile the father was reading a book aloud to Jack [during a supervised visit], Grace approached the monitor and said: '[Ms. Przeciechowska], my dada touched my butt,' the monitor didn't make a comment, and Grace repeated, 'My dada touched my butt.'  The monitor looked at the child and

said, 'Grace, I appreciate that you want to share this with me,' and Grace commented: '<u>My mom told me</u>.'" (Emphasis added.)

Last, Nurse Baumstark testified that before her examination of the children, when she gathered information from Mother, Mother remained about five or ten feet away from where the children were playing with another staff member in the examination room. The nurse conceded that pre-examination information she obtained from Mother about the purported disclosures may have been overheard by the children. Later, during the examination, Jack reported, "dad put his finger in my butt." This statement was not made in response to any question posed by Baumstark. Again, while not conclusive, this evidence supports FOF 100 finding that Mother "coached the minor children to make statements regarding inappropriate touching by Father which when reported to third parties would lead a reasonable person to believe that Father had sexually abused the children even where he had not."

The family court therefore did not abuse its discretion in finding "substantial, credible evidence" that Mother coached the children to make statements suggesting inappropriate touching by Father.

The record also supports the court's finding that "Mother's parents appear to exert a level of unreasonable influence and undue control over Mother including her parental decision-making

regarding the minor children and her child-rearing actions." CE Shiner reported that Mother characterized Maternal Grandmother's independent April 2021 report to CWS as "going overboard," and that "[Father] told [Mother] he wanted to take [the] kids back to Utah but Maternal Grandma blocked it." SW Reinecke also reported that regarding Maternal Grandmother's April 2021 report to CWS, "[Mother] acknowledged she met with DHS SW Leslie Armstrong and did share she felt her mom had 'jumped the gun' [in telling Father he 'could not come around' and calling CPS on Father] and she had no concerns regarding [Father's] care of them." Many of the reports of alleged inappropriate behavior by the children have also been reported to Mother by Maternal Grandmother.

The family court also found that "Mother's parents have consistently taken the position and have taken action in furtherance of obtaining custody of the minor children [sic] Mother and Father should give custody of the children." Mother reported to SW Reinecke that in March 2021, "[t]here was a 'small' confrontation between Maternal Grandma and [Father,] with Maternal Grandma telling Father he could not come around. [Mother] shared she thought maybe her mom was being 'vindictive' . . . . Maternal Grandma then called CPS on [Father.]" Mother disputed Maternal Grandmother's abuse claims

at the time, and felt that Maternal Grandmother had "jumped the gun," and that she "was going overboard."

During the custody proceedings, Maternal Grandmother suggested to CE Shiner that the children should remain in the Maternal Grandparents' home. "The kids have lived in our house, with [Mother], their entire life," she told CE Shiner. "How could [Father] be the one who gets primary custody?" Even though eventually "[Mother] would have her own house," Maternal Grandmother said, "[t]hey've all been living with me and my husband most of the time [Mother and Father] were together."

SW Armstrong reported that "Father believes [the sexual abuse] allegations were started so that he would not get custody of the children as the maternal grandparents want the children." CE Shiner reported that "[Father] is very concerned that Mother has been making false allegations about him molesting the children, and he thinks it may partly be due to [Maternal Grandmother] wanting to have custody of the children, something she has proposed multiple times since the children were born."

Paternal Grandmother reported to CE Shiner that "[Maternal Grandmother] misled [Father], she went to great lengths to deceive him and his family about this [living] arrangement and has asked on occasion for [Father] to sign his rights away so [Maternal Grandmother] can raise [the children]. . . . [Paternal Grandmother does not] think [Mother] or her parents

72

will ever support [Father] having a healthy relationship with his children." Father also testified that he told Mother that he wanted to take the children back to Utah partly because he could then "see them every day and [he] can be their father rather than [Maternal Grandmother] having them all the time."

Thus, the record supports that Mother is unable to protect her children from the Maternal Grandmother's desire to gain custody of the children and her interference with the children's relationship with Father.

Based on the foregoing, we hold that the family court correctly concluded that Mother is unable to separate her needs (and her own parents' needs) from her children's needs under HRS § 571-46(b)(12).

### 3. The record supports that Father is more secure in his sobriety than Mother

We conclude that the family court did not err in finding that while both parties have a history of drug use, Father has greater insight into addiction and is more stable and secure in his sobriety than Mother. See HRS § 571-46(b)(13) ("[a]ny evidence of past or current drug or alcohol abuse by a parent").

First, the court found that Mother had misrepresented her date of sobriety and had not definitively stated for the record her sobriety start date. FOF 30 reads:

> Mother has been a habitual drug user of opioids and methamphetamine but has been drug free since at least

73

> August, 2021. Mother reported to the custody evaluator in July, 2021, that she had been sober since April 10, 2020, but then admitted she had relapsed with her boyfriend in July, 2020. Her psychiatrist reported that she denied use of methamphetamines after June 2020. Mother did not definitely state her date of sobriety in the record.

FOF 30 is supported by the record.

The court also found that Mother was "uncomfortable" in describing taking heroin and methamphetamine, which demonstrates a developing "awareness" of her addiction and "the power of the substances for which she has an addiction." On the other hand, the court found that Father was more candid, describing his experience of using heroin and methamphetamine as "the best feeling in the world." "The Court [found] that both parents have the likelihood of relapse. Based on the testimony and evidence presented, Father has deeper and clearer insight into his addiction, his present state as well as his history of drug use." Father told CE Shiner that he was "secure" in his sobriety, and Paternal Grandmother testified that Father has always been "very honest with [her] about even his fails as far as drug use or substance abuse issues." Further, "Father's housemate testified that he had not seen Father consume alcohol since March, 2021 and had not seen him ingest any drugs. Father's employer also indicated that she would not tolerate any drug use by Father."

Thus, the court properly determined that Father has greater insight into his addiction and sobriety and Mother, and that HRS

§ 571-46(b)(13) weighed in favor of the court granting Father custody.

**4. The record supports the family court's finding that Father has a positive, loving relationship with the children**

Sufficient evidence supports that Father has a positive, loving relationship with his children. Thus, the court did not err in concluding that Father's positive relationship with his children under HRS § 571-46(b)(3) ("[t]he overall quality of the parent-child relationship") and HRS § 571-46(b)(7) ("emotional needs of the child") weighed in favor of Father's sole custody and relocation.

First, the family court found that "Father had several supervised visits monitored by [a visit supervisor]. The [s]upervisor reported that the visits demonstrated Father and the children had normal and pleasant interactions and that the minor children appeared to be comfortable around Father." It also found that "Father's housemate and immediate supervisor testified that Father was bonded with the minor children and that the interactions were happy and normal."

These findings are supported by the record. CE Shiner also reported that "Father's interactions with the children appeared to be caring and playful, with him tending to their needs and being appropriately protective," and that "Father appears to be a caring, nurturing parent, and the children appear comfortable

with him."  Father's co-worker testified that it was "inspiring . . . [to] see how [Father] connects with his children and goes above and beyond for [them].  It's very spectacular."  Father and Paternal Grandmother also testified that the children are close with Father and love Father.

We disagree with the dissent's recasting of Mother's appellate argument - that the family court erred because it granted Father custody based *solely* on Mother's misuse of the protection from abuse process - to suggest that the court ignored the children's emotional needs when awarding custody.  Mother's history of having informal primary custody does not mean that she is better equipped than Father to meet the children's emotional needs.  As discussed, the record supports that Father had a positive relationship with both children, and thus, he could meet their emotional needs in Utah.  Conversely, the record supports the court's findings and conclusions regarding Mother's inability to separate her own needs from her children's needs, Mother's minimal insight into her sobriety, her history of exposing the children to an abusive boyfriend, and her interference with Father's relationship with his children.  The record supports that the court carefully considered the statutory factors and did not abuse its discretion in granting Father sole custody.

5.    **Evidence suggests Mother does not provide adequate
      health care to support the physical health needs of
      the children**

Evidence also supports that Father is better equipped to
support the physical health needs of the children.  Mother had
failed to obtain health insurance or regular health care for the
children.  See HRS § 571-46(b)(6) ("The physical health needs of
the child.").

The record reflects that Mother ascribes to therapeutic
remedies, and did not seek proper pediatric care for the
children.  In Maui, Mother worked from home part-time at
Maternal Grandmother's company "Weed Steam Hawaii" (a weed
control company) as an office assistant, and earned $600 per
month and room and board.  She also received $610 in Temporary
Assistance for Needy Families and $1,000 in food stamps.  Given
the financial support from her parents, it is unlikely she
lacked funds to acquire insurance or health care for the
children.  No other reason appears on the record for Mother's
failure to acquire health care for the children between December
2019 (their move to Maui) and July 2021 (CWS' report
recommending the children be seen by a pediatrician).

It was reported that the children may have reported buttock
pain because they had untreated pinworms.  The family court
found that "[t]he minor children suffered from pinworm
infections that Mother did not have treated by a health care

professional." SW Reinecke reported that "[the children] do not have medical coverage and have not been to any physician for exams. Reportedly Mother and Maternal Grandma ascribe[] to naturopathic medicine. Maternal Grandma relayed Mother stated the kids had pinworms and were treated with over the counter medication. It is unknown whether the treatment was successful and condition resolved." CE Shiner reported that "[Father] is concerned that Mother has not been taking the children to regular doctor visits, as she is 'antidoctor,'" and that "Father's mother, says that Mother's mother 'has paid a doctor to forge their immunization records to be able to enroll them in school and daycare.'"

Per HRS § 571-46(b)(6), the court shall consider "[t]he physical health needs of the child[ren]." Evidence shows that Mother did not provide for the physical health needs of the children, and thus supports the family court's broader conclusion that "Mother is not present[ly] a fit or proper parent who can provide a stable, safe and wholesome home for the minor children."

6. **Mother's actions interfered with Father's interactions with his children**

The record suggests that because of Mother's allegations of child sexual abuse against Father and repeated interrogation of her young children, Mother impacted Father's visitation with the

children and harmed Father's relationship with his children.
See HRS § 571-46(b)(11) (each parent's actions demonstrating
that they allow the child to maintain family connections through
family events and activities).  The evidence showed that because
of Mother's allegations, Father no longer wanted to visit the
children at Mother's parents' house.  He also surreptitiously
audio recorded visits with his children because he feared more
false allegations.

The family court concluded that "[o]ne parent's making of
unfounded allegations of child abuse against another parent
including by coaching a child to make false allegations of abuse
so as to cause the restriction or interference with the
visitation of the child by the other parent are acts so
inconsistent with the best interests of the child that it raises
a strong probability that the offending parent is unfit to act
as a custodial parent."

As described above, evidence supports the family court's
finding that Mother induced the children to make statements
suggesting sexual abuse by Father.  Father testified that after
Mother fabricated the story about an alleged video of him
abusing the children in August 2020, he recorded his visits with
the children on his phone "to protect [himself] from these
allegations."  SW Armstrong also testified that Father shared
that he was recording his unsupervised visits.

79

The family court also stated in FOF 101 that "[t]he court is extremely concerned that the litigation of this proceeding, the numerous evaluations, investigations and interviews to which the children have been subjected, and the pressures brought to bear on the children by Mother and her family have impaired the minor children's trust and confidence in the social institutions designed to protect them from harm in addition to hav[ing] alienated them from their Father." (Emphasis added.)

Mother's interference with the paternal relationship is supported by the record. SW Reinecke reported that "[Father] stated things just started getting worse and [Maternal Grandmother] would come by and peek in the room with him and the kids without knocking. He did not want to have visits at her house anymore."

Father testified that Jack seemed reluctant to visit with him, because he believed "[the children] are being grilled and asked questions by [M]other and therapist right after [Father's] visits accumulating to Jack not wanting to come and see [Father] in the first place." SW Reinecke also reported that the children stopped letting Father assist them with toileting and bathing:

> Due to things their mom and grandparents say to [the children], it makes it harder for [Father] to take care of them. Usually, after Jack poops, Father has him stand up so he (father) can better wipe him. Jack refused to stand up now so he (father) has to wipe him while he is sitting on potty. This has progressed to now, he has to leave

> bathroom when kids are using it. [Father] relayed he is scared to help kids with bathing and personal hygiene. He has not helped them bath[e] in 2-3 months.

Thus, the record supports the court's reasoning that Mother interfered with the children's relationship with Father. See HRS § 571-46(b)(11).

**7. Father's relocation plan was realistic, credible, and sustainable**

Last, we hold that the family court properly concluded that Father is "a fit and proper parent who can provide a stable, safe[,] and wholesome home for the minor children in Utah" and that his relocation plan was "realistic, credible, and sustainable." The record supports that Father is an engaged parent with significant family support, housing, and resources to care for the children in Utah. The children were born in Utah, and had only spent about a year in Hawai'i before Mother sought sole custody. They are close with family members in Utah.

Mother was born and raised in Colorado, Oregon, and Utah. She does not have strong ties to Hawai'i other than her parents' support in providing her housing at their rental home. While the record is unclear as to why Mother's parents moved from Utah to Hawai'i, Mother still has family living in Utah that she could live with if she chooses to move back to Utah and have supervised visits.

81

The record supports that Father has a positive relationship with his children and has been involved in their upbringing. Father was engaged in caregiving of the children before Mother and Father's separation. See HRS § 571-46(b)(4) (the history of caregiving or parenting by each parent prior and subsequent to a marital or other type of separation). FOF 61 reads: "Until the minor children moved to Maui, Father actively and equally participated in the rearing of the minor children." Even though Mother was a "stay-at-home mom" while Father worked in Utah, Father testified that "I'd come home [from work] and we'd cook dinner. I'd help change diapers, clean rooms, play with the kids as much as I could, help put them to bed. We all shared the same bed." Paternal Grandmother also testified that "[Father] always has been an everyday part of their life. It's only since they moved to Hawaii that he hasn't."

Since moving to Hawaiʻi, Father has sought to improve his circumstances so that he can be a present, involved parent. He took a second job, and obtained his employer's permission to use a three-bedroom home on the farm for when his children visited. He visited the children and co-parented with Mother at Mother's parents' home on the weekends until Mother began making accusations of abuse.

FOFs 54 through 64, supported by the record, detail full family support in Utah. Father testified that he would seek re-

82

employment at his prior distribution job in Utah, and that his employer would let him "come back." Paternal Grandfather offered an apartment type living area in his home that Father and children could reside in. This home would be within ten miles of Father's two siblings who are willing to provide child care for Father while he works. Father's siblings also have young children close in age to the children.

The children were born in Utah, and were connected to family (like their cousins) in Utah before moving to Maui. Even after moving to Hawai'i, the children spoke to their cousins over FaceTime and "have feelings for one another." Paternal Grandmother lives twenty minutes from Father's proposed residence, already maintains contact with the children via FaceTime and phone, and is willing to retire early to help Father if needed. None of Father's family have alcohol or drug issues. Thus, we hold that the record supports the family court's holding that awarding Father sole legal and physical custody of the children, granting the relocation request, and awarding Mother supervised visitation is in the best interest of the children.

We hold that there was no abuse of discretion by the family court.

8.   **The family court did not err in finding clear and convincing evidence of Mother's abuse of process**

Mother alleges that the court based its decision "solely" on her misuse of process in bringing "false allegations of abuse." She maintains that the ICA erred in "summarily" affirming the family court's decision to dissolve Judge Heely's amended protective order, grant Father sole custody and relocation to Utah, and limit Mother to supervised visitation based "solely" on her request for said protective orders.

Mother ignores the record. As detailed, the family court considered far more than Mother's abuse of process. Mother's argument lacks merit.

We hold that the family court did not clearly err in concluding that there is clear and convincing evidence that Mother misused the protection from abuse process.

Per HRS § 571-46(b)(16), the family court may consider clear and convincing evidence of abuse of process by a parent in determining the best interest of the child:

> (16)  A parent's prior wilful misuse of the protection from abuse process under chapter 586 to gain a tactical advantage in any proceeding involving the custody determination of a minor. Such wilful misuse may be considered only if it is established by clear and convincing evidence, and if it is further found by clear and convincing evidence that in the particular family circumstance the wilful misuse tends to show that, in the future, the parent who engaged in the wilful misuse will not be able to cooperate successfully with the other parent in their shared responsibilities for the child. The court shall articulate findings of fact whenever relying upon this factor as part of its determination of the best interests of the child.

HRS § 571-46(b)(16).

The family court found the following related to abuse of process:

> 104.  Mother filed a total of eight ex parte petitions for an HRS § 586 temporary restraining order during the pendency of [this case].  Seven of those eight ex parte petitions were denied.  In light of the full record and additional information presented before the Court at trial, the eighth petition will also be dissolved due to insufficient evidence.
>
> 105.  By clear and convincing evidence, Mother misused the protection [from] abuse process under chapter 586 to gain a tactical advantage in this proceeding.  Mother's misuse of the protection from abuse process was intentional and voluntary.
>
> 106.  By clear and convincing evidence, Mother's misuse tends to show that she will not be able to cooperate successfully with Father in their shared responsibilities for minor children.

Mother filed four sets of TROs on behalf of Jack and Grace against Father between June 18, 2021, and October 20, 2021.  Though win-loss record is not decisive to HRS § 571-46(b)(16) misuse of process, seven of the eight TROs were dismissed.

Clear and convincing evidence "will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established, and requires the existence of a fact be highly probable."  Iddings, 82 Hawai'i at 13, 919 P.2d at 275.

Mother filed the TROs in connection with her escalating allegations and court proceedings.  Given the court's findings regarding Mother's coaching of the children to make disclosures,

and the timing of the TROs, we hold that there was circumstantial evidence to support that Mother filed TROs to gain an advantage in the custody proceedings. See id. Thus, the court did not clearly err in finding that it was highly probable Mother wilfully abused the protection from abuse process. See id.

Mother was self-represented when she filed the first two TROs. She filed the first set of TROs on June 18, 2021, about two weeks after the family court ruled against her custody request, and five days after reporting sexual abuse of the children to MPD. The court dismissed that set of TROs.

On June 30, the day after the June 29, 2021 CJC interview where neither child made disclosures of sexual abuse, Mother filed another set of TROs on behalf of the children. There were no disclosures during the interviews, so the court could reasonably infer that Mother's TRO was not filed based on new information, but rather to gain a tactical advantage. The petitions were denied without a hearing.

On August 12, 2021, Father filed a motion for emergency custody and relocation. Mother then filed what the court called a "rushed TRO" the day before the August 27, 2021 hearing on Father's motion for emergency custody and relocation. According to the court, the TRO contained similar allegations to those brought when Mother was self-represented. Mother served the TRO

on Father on August 26 after business hours, but did not serve Father's counsel in the morning before the August 27, 2021 hearing.

Mother's counsel claimed the TRO was filed to prevent sexual abuse by Father during visits. Father's counsel countered that Mother tactically filed the TRO - there were no scheduled visits before the court hearing. Visitation could have been discussed in court the next day. The family court was skeptical of Mother's intentions. It questioned whether the filing was made for another reason. The custody evaluator had "just [submitted] their report on August 5th." The court thus questioned Mother's motives, and whether it was "a strategic move on [M]other's part to file this petition after the professional custody evaluator [filed her report with the court]." The court also suggested that "it may be a strategic move on [M]other's part to alienate, further alienate and deny [F]ather his rights of meaningful contact with children."

Those TROs were later dismissed by stipulation. The record supports that Mother strategically filed the TRO to gain an advantage during the August 27, 2021 hearing and the proceedings generally.

On October 20, 2021, Mother again filed a set of TROs. Now she alleged that the children had disclosed sexual assault to Dr. Goldberg. The court granted a protective order on behalf of

87

Jack in November 2022, and dismissed the TRO filed on behalf of Grace.  (After trial, the family court dissolved the TRO.)

Collectively, this evidence shows that Mother's misuse of the protection from abuse process was wilful.  See Iddings, 82 Hawai'i at 13, 919 P.2d at 275.  Thus, we hold that the family court did not err by finding that Mother wilfully misused the protection from abuse process by clear and convincing evidence, and that this factor weighed in Father's favor in granting Father custody.

C.   **Motion for Reconsideration**

On April 7, 2022, Mother filed a motion for reconsideration and further hearing pursuant to HFCR Rules 59 and 60.  The family court denied the motion.  The ICA affirmed the family court's denial.

Mother argues before this court that "one full day (1/28/22), a half day (1/31/22) and two hours on a third (2/15/22), [was] not near enough time for multiple experts and the parties to address custody, visitation, relocation and a protective order finding a threat of sex abuse."

"The family court may grant a motion for a new trial 'to all or any of the parties and on all or part of the issues for good cause shown[.]'"  Doe v. Doe, 98 Hawai'i 144, 150, 44 P.3d 1085, 1091 (2002) (quoting HFCR Rule 59(a)).  A court may grant a Rule 60(b) motion for relief from judgment or order "upon a

88

showing of exceptional circumstances." Thomas-Yukimura v. Yukimura, 130 Hawai'i 1, 9, 304 P.3d 1182, 1190 (2013) (citing HFCR Rule 60(b)(6)). Motions for a new trial and reconsideration are reviewed under the abuse of discretion standard. Doe, 98 Hawai'i at 150, 44 P.3d at 1091.

We hold that the family court did not abuse its discretion in denying Mother's motion.

First, we hold that Mother failed to show exceptional circumstances justifying relief from judgment under HFCR Rule 60(b). As analyzed above, the family court did not abuse its discretion in awarding Father sole legal and physical custody and allowing relocation. Mother's arguments that the family court was biased and abused its discretion do not constitute exceptional circumstances justifying relief. See HFCR Rule 60(b). The ICA's correctly affirmed the family court's denial of this motion.

Second, we hold that the family court did not abuse its discretion in denying the motion for new trial under HFCR Rule 59. Mother did not show good cause. The ICA correctly affirmed the family court's denial of this motion.

Mother called nearly the same number of witnesses as Father. Of the eleven non-party witnesses, Mother called five witnesses: SW Armstrong, Dr. Goldberg, Nurse Baumstark, Psychologist Riggs, and Dr. Teliho. Psychologist Riggs and

Nurse Baumstark were called as expert witnesses. Mother does not say how her other four proposed expert witnesses (two were Utah-based realtors) would have added further probative evidence as to whether Father should have sole legal and physical custody of the children. See Doe, 98 Hawai'i at 156, 44 P.3d at 1097 (court abused its discretion in declining to allow *any* of Mother's witnesses to testify because their testimony "was pertinent to whether Father should have sole legal and physical custody of Child").

Father called six witnesses: Detective Satterfield, CWS social worker Christianna Bhader, SW Reinecke, Psychologist Riggs, Paternal Grandmother, and his co-worker. The family court did not err in allowing Father one more witness than Mother.

At the close of evidence, the court asked the parties, "Are there any other matters that the parties need to bring to the Court's attention?" Mother did not request to call any more witnesses. Aside from retrospectively citing the length of the trial, Mother did not present any reasons for why she could not have called other witnesses.

Thus, we hold that the court did not abuse its discretion in denying the motion for reconsideration and continued hearing under HFCR Rules 60 and 59.

**D.    Post-Decree Relief**

Given the impact of child custody decisions on children, parents, and family systems, we stress the availability of post-decree relief in family court proceedings.  Custody awards are subject to modification or change "whenever the best interests of the child require or justify the modification or change." Waldecker v. O'Scanlon, 137 Hawai'i 460, 470, 375 P.3d 239, 249 (2016) (citing HRS § 571-46(a)(1) and (6)).  Thus, Mother may seek post-decree relief if she believes the best interest of the children require modification or change to the existing order. See id.

**III.**

We affirm the ICA's May 6, 2024 judgment, the family court's March 28, 2022 Findings of Fact, Conclusions of Law, Decision and Order, and the family court's April 25, 2022 Order Denying Petitioner's Motion for Reconsideration, Clarification and Further Hearing.

| | |
|---|---|
| Peter Van Name Esser<br>for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Todd W. Eddins |
| Benard M. Herren<br>for respondent | /s/ Vladimir P. Devens |

